**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| C.B., L.M., and D.D., on behalf of themselves and all others similarly situated, | Case No._____ |
| *Plaintiffs*, | **CLASS ACTION** |
| v. | |
| PLANNED PARENTHOOD FEDERATION OF AMERICA, INC., PLANNED PARENTHOOD GREATER MEMPHIS REGION, INC., PLANNED PARENTHOOD SOUTHEAST, INC., and PLANNED PARENTHOOD OF FLORIDA, INC., as successor in interest to PLANNED PARENTHOOD OF SOUTHWEST AND CENTRAL FLORIDA, INC., | **JURY TRIAL DEMANDED** |
| *Defendants.* | |

**CLASS ACTION COMPLAINT**

Plaintiffs C.B., L.M., and D.D., on behalf of themselves and all others similarly situated, bring this class action complaint ("Action") against Defendants Planned Parenthood Federation of America, Inc. ("PPFA"), Planned Parenthood Greater Memphis Region, Inc. ("Planned Parenthood Tennessee"), Planned Parenthood of Florida, Inc. ("Planned Parenthood Florida"), and Planned Parenthood Southeast, Inc. ("Planned Parenthood Georgia") upon personal knowledge as to themselves and their own actions, and upon information and belief, including the investigation of their counsel, as to all other matters.

**INTRODUCTION**

"Planned Parenthood . . . cares about your privacy."

—*www.plannedparenthood.org/privacy-policy*

1.      Few areas of American life so plainly demand confidentiality, or so plainly receive it as a matter of right, as a patient's pursuit of sexual and reproductive health care. The decision to seek a birth-control prescription, screening for a sexually transmitted infection, or counsel regarding pregnancy and abortion implicates not just the patient's health but their bodily autonomy, sexuality, family life and, in some states, their freedom from criminal prosecution. Disclosure of a person's health care information can occasion social stigma, intimate-partner conflict, employment consequences, harassment, and, even criminal exposure.

2.      PPFA and its independently-incorporated affiliates have built their public identity on the protection of patients pursuing sexual and reproductive care. PPFA operates plannedparenthood.org—one of the most visited reproductive health websites in the United States—as "America's Most Trusted Name in Sexual Health®."[1] They tell the public—repeatedly—that their patients' health information "is protected by state and federal law," and that their independently incorporated affiliates safeguard patient records under the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") and its implementing regulations.[2]

3.      The unique stigma that attaches to reproductive health care—and the unique willingness of certain ideologically motivated individuals to act on that stigma—is well documented. According to the National Abortion Federation, the professional association of abortion providers, anti-abortion extremists committed hundreds of violent incidents at clinics in

---

[1] *See plannedparenthood.org Competitors – Top Sites Like plannedparenthood.org*, SIMILARWEB, https://www.similarweb.com/website/plannedparenthood.org/competitors/ (last visited May 28, 2026) (reflecting plannedparenthood.org traffic as fifth for women's health in the United States); *Who We Are*, PLANNED PARENTHOOD, https://www.plannedparenthood.org/about-us/who-we-are (last visited May 28, 2026) (Planned Parenthood affiliates "provide essential care to 2.1 million patients annually" and "[o]ne in three women in the United States has visited a Planned Parenthood health center").

[2] *See, e.g.*, *Privacy Notice*, PLANNED PARENTHOOD (Nov. 19, 2024), https://www.plannedparenthood.org/privacy-policy.

2023 and 2024 alone, including 621 trespassing crimes, 296 death threats or threats of harm, 169 incidents of vandalism, 38 assaults and batteries, 37 stalking incidents, 17 thefts, and 13 clinic invasions.[3] In 2025, NAF recorded a 113% increase in death threats and a 111% increase in stalking incidents targeting abortion providers.[4]

4.    Against that backdrop, PPFA maintains extensive physical security infrastructure at its health centers. It deploys volunteer clinic escorts trained to shield patients from harassment as they enter and exit,[5] and it works with the National Abortion Federation,[6] which "provides [its] members with 24-7 assistance with security incidents, threats, or emergencies."[7] PPFA, in short, well understands that the patients it serves require not only excellent care, but also protection from those who would seek to harm them for receiving that care.

5.    PPFA's online privacy and security protections are a very different story. On plannedparenthood.org, PPFA sets up its homepage and "Book an Appointment" pages to automatically activate tracking and advertising scripts from at least sixteen different outside

---

[3] *NAF 2024 Violence & Disruption Report*, NAT'L ABORTION FED'N, https://nationalabortionfederation.org/safety-security/2024-naf-violence-disruption/ (last visited May 28, 2026).

[4] *2025 Violence & Disruption Report*, NAT'L ABORTION FED'N, https://nationalabortionfederation.org/safety-security/2025-naf-violence-disruption/ (last visited May 28, 2026).

[5] *See, e.g.*, *Volunteer Clinic Escorts*, PLANNED PARENTHOOD N. CENT. STATES, https://www.plannedparenthood.org/planned-parenthood-north-central-states/get-involved/volunteer-clinic-escorts (last visited June 7, 2026); *Clinic Escort Program*, PLANNED PARENTHOOD ARIZ., INC., https://www.plannedparenthood.org/planned-parenthood-arizona/get-involved/volunteer/clinic-escort-program (last visited June 7, 2026).

[6] *NAF Members*, NAT'L ABORTION FED'N, https://nationalabortionfederation.org/naf-members/ (last visited June 7, 2026).

[7] *See 2025 Violence & Disruption Report*, NAT'L ABORTION FED'N, https://nationalabortionfederation.org/safety-security/2025-naf-violence-disruption/ (last visited May 28, 2026).

companies—including Meta (Facebook), TikTok, Pinterest, Microsoft Bing, Quantcast, and several ad networks—*before* a user has even clicked anything on the cookie consent banner.

6.    For example, when a patient moves through the "Book an Appointment" flow and enters the information required to schedule a visit, PPFA transmits to Google—all at once:

   a.  **What the patient is there for:** for example, whether they selected "Abortion," "STD Testing," or "Birth Control" from the booking menu;

   b.  **Personal details:** their ZIP code and age; and

   c.  **Who they are:** a persistent identifier Google (cid) already has on that person, which it uses to follow them across every other website that uses Google Analytics.

7.    Most shocking of all, if a patient selects "Abortion" as the desired service, PPFA also sends to Google the person's last menstrual period date—one of the most intimate pieces of health information a woman has.

8.    PPFA's independent affiliates—including Planned Parenthood Florida, Planned Parenthood Tennessee, and Planned Parenthood Georgia—are HIPAA-covered entities, and PPFA holds them out as such on its own Privacy Notice.[8] The Privacy Notice's representations to patients are clear that patient and health-plan-member information provided to PPFA affiliates "to obtain pharmacy, medical, or healthcare services online or in person" is "protected by state and federal law."[9]

9.    Yet when a patient completes PPFA's "Book an Appointment" flow and selects a particular affiliate health center, the patient is sent to another site: myplannedparenthoodchart.org. This is Planned Parenthood's version of MyChart—the dominant patient-portal product in the

---

[8] *Privacy Notice*, PLANNED PARENTHOOD (Nov. 19, 2024),
https://www.plannedparenthood.org/privacy-policy.
[9] *Id*.

3

United States, used by more than 190 million patients across the hospitals and health systems that run on Epic's electronic health record software.[10]

10.     PPFA's MyChart page, however, keeps on tracking. It loads Google Tag Manager, the Meta (Facebook) Pixel, session-replay tools, and more data sent to Google Analytics. Those new transmissions to Google carry the same persistent identifier (cid) that was already attached to the patient during the early steps of the "Book an Appointment" flow.

11.     In sum, PPFA discloses to Google what health care service the patient intended to book, their ZIP code, age, and—for abortion patients—their last menstrual period date. PPFA's affiliates then also disclose the additional fact that the same identified person proceeded into the affiliates' medical patient-portal to schedule their desired care.

12.     Plaintiffs and the patients they represent did not come to Planned Parenthood lightly. Some came to obtain common and necessary checkups or preventative care. Other sought counsel or procedures for a standalone medical need. No matter the reason, many arrived carrying fear, uncertainty, or grief, and the simple courage it takes to seek this care in the face of a world that too often punishes the choice to seek it. They came because Planned Parenthood promised them a safe place to do so—and promised, in plain words, that what they shared would stay protected. That promise is why they trusted it with the most private facts of their lives.

13.     Plaintiffs bring this Action, on behalf of themselves and all others similarly situated, to hold Defendants accountable for breaking that trust, to recover for the harms that followed, and to compel Defendants to change their online data tracking and sales practices to honor the privacy promises on which their patients relied.

---

[10] Margo Steinlage, *22 Medical Software Companies to Know*, BUILT IN (Dec. 19, 2025), https://builtin.com/articles/medical-software-companies (Epic holds 42% of the U.S. EHR market and "more than 190 million patients use Epic's MyChart patient portal").

## JURISDICTION AND VENUE

14.     **Subject Matter Jurisdiction.**  This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d).  The amount in controversy exceeds the sum of $5,000,000 exclusive of interests and costs, there are well over 100 putative Class members, and minimal diversity exists because one or more putative Class members are citizens of a different state than at least one Defendant. Plaintiff C.B. is a citizen of Florida, Plaintiff D.D. is a citizen of California, Plaintiff L.M. is a citizen of North Carolina, and Defendant Planned Parenthood is a Delaware not-for-profit corporation with its principal place of business in New York, New York.

15.     **Personal Jurisdiction.**  This Court has personal jurisdiction over Planned Parenthood Federation of America, Inc. because it is a resident of, and maintains its headquarters within, this District. The Court has personal jurisdiction over Planned Parenthood Florida, Planned Parenthood Tennessee, and Planned Parenthood Georgia because in booking their respective appointments with these affiliates, patients first access Planned Parenthood Federation of American, Inc.'s flagship website, plannedparenthood.org, and each accepted patient interactions routed to it through that website.

16.     **Venue.**  Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because Defendant Planned Parenthood Federation of America, Inc. conducts business in this District and a substantial part of the events, acts and omissions giving rise to Plaintiffs' claims occurred in this District.  Venue is also proper under Planned Parenthood Federation of America, Inc.'s own Terms of Use, which provide that "any claim or cause of action arising out of or related to this Website, or the use of this Website . . . must be filed in a court in New York, New York, U.S.A."

**PARTIES**

**Plaintiff C.B.**

17.     Plaintiff C.B. is a citizen of the State of Florida residing in Brooksville, Florida. On dates including but not limited to 2022 and 2023, Plaintiff C.B. used Planned Parenthood's website, plannedparenthood.org, to research reproductive-health information and to book appointments at Planned Parenthood health centers, including the Lakeland Health Center in Lakeland, Florida, and the Memphis Health Center in Virginia Run Cove in Memphis, Tennessee. In her various visits to Planned Parenthood affiliates, Plaintiff C.B. received a variety of health services, treatment for UTIs, birth control (a Liletta IUD), and sexual health services.

**Plaintiff D.D.**

18.     Plaintiff D.D. is a citizen of the State of California residing in Hawthorne, California. On dates including in or around September 2025 and February 2026, Plaintiff D.D. used Planned Parenthood's website, plannedparenthood.org, to research and inquire about termination-of-pregnancy services.

**Plaintiff L.M.**

19.     Plaintiff L.M. is a citizen of the State of North Carolina residing in Cameron, North Carolina. On dates including but not limited to 2021, Plaintiff L.M. used Planned Parenthood's website, plannedparenthood.org, to research reproductive-health information and to book an appointment at Planned Parenthood's Savannah Center in Savannah, Georgia. In such appointment, Plaintiff L.M. received termination-of-pregnancy services.

**Defendant Planned Parenthood Federation of America, Inc.**

20.     Defendant Planned Parenthood Federation of America, Inc. is a Delaware not for profit corporation with its principal place of business in New York, New York. Planned

Parenthood Federation of America, Inc. is tax-exempt under Internal Revenue Code section 501(c)(3).

21.     Planned Parenthood Federation of America, Inc. owns and operates the website plannedparenthood.org as a "federation-wide web initiative" that includes both Planned Parenthood Federation of America, Inc.'s content as well as that of its independently-incorporated affiliates.

**Defendant Planned Parenthood of Florida, Inc.**

22.     Defendant Planned Parenthood of Florida, Inc. is a Florida not for profit corporation with its principal place of business in West Palm Beach, Florida. Planned Parenthood of Florida, Inc. is tax-exempt under Internal Revenue Code section 501(c)(3).

23.     Planned Parenthood of Florida, Inc. is the successor in interest, by merger effective on or about June 24, 2025, to Planned Parenthood of Southwest and Central Florida, Inc. and to Planned Parenthood of South Florida and the Treasure Coast, Inc.

24.     Planned Parenthood of Southwest and Central Florida, Inc. operated the Lakeland Health Center in Lakeland, Florida during the period in which Plaintiff C.B. obtained care there.

**Defendant Planned Parenthood Greater Memphis Region, Inc.**

25.     Defendant Planned Parenthood Greater Memphis Region, Inc. is a Tennessee not for profit corporation with its principal place of business in Memphis, Tennessee. Planned Parenthood Greater Memphis Region, Inc. tax-exempt under Internal Revenue Code section 501(c)(3).

26.     Planned Parenthood Greater Memphis Region, Inc. operated the Memphis Health Center in Virginia Run Cove during the period in which Plaintiff C.B. obtained care there.

7

**Defendant Planned Parenthood Southeast, Inc.**

27.     Defendant Planned Parenthood Southeast, Inc. is a Georgia not for profit corporation with its principal place of business in Atlanta, Georgia. Planned Parenthood of Florida, Inc. is tax-exempt under Internal Revenue Code section 501(c)(3).

28.     Planned Parenthood Southeast, Inc. operated the Savannah Center during the period in which Plaintiff L.M. obtained care there.

**FACTUAL ALLEGATIONS**

**A.      Since *Dobbs*, Federal and State Law Have Only Strengthened the Confidentiality of Reproductive Health Information**

29.     The information that Planned Parenthood prides itself on protecting is sensitive, personally identifiable, and exceedingly private.

30.     Americans expect privacy when it comes to their reproductive health information. That expectation is especially strong where disclosure could reveal a person's sexual preferences, sexual orientation, or pregnancy status—and it has only intensified since the U.S. Supreme Court ended the constitutional right to abortion in *Dobbs v. Jackson Women's Health Organization*, 597 U.S. 215 (2022).

31.     In the years since *Dobbs* returned abortion regulation to the states, the national landscape has fractured into a patchwork that continues to change.[11] As of mid-2026, thirteen states enforce total abortion bans subject only to narrow exceptions,[12] and another twenty-eight restrict abortion based on gestational duration—so that forty-one states now enforce bans of some kind.[13]

---

[11] *State Bans on Abortion Throughout Pregnancy*, GUTTMACHER INST. (June 4, 2026), https://www.guttmacher.org/state-policy/explore/state-policies-abortion-bans (describing the post-*Dobbs* landscape as continuing "to shift rapidly").
[12] *Id.*
[13] *Id.*

32.     Reproductive health information is therefore not only confidential and sensitive but, precisely because of *Dobbs* and the concomitant criminalization of abortion in many states, more sacrosanct and legally protected now than ever before.

33.     PPFA is a federally tax-exempt 501(c)(3) non-profit membership organization dedicated to ensuring access to comprehensive reproductive and complementary health care services and education. PPFA owns the domain www.plannedparenthood.org.[14]

34.     PPFA does not itself provide health care; instead, it supports the work of its member affiliates, and in certain situations functions as a HIPAA "business associate" or "service provider," processing patient or health plan member information on the affiliates' behalf pursuant to contract.[15]

35.     PPFA affiliates—including Defendants Planned Parenthood Florida Planned Parenthood Tennessee, and Planned Parenthood Georgia—are separately incorporated 501(c)(3) public charities that operate the health centers and deliver clinical care across the country.[16]

36.     PPFA affiliates function as covered entities pursuant to the Health Insurance Portability and Accountability Act ("HIPAA").[17]

---

[14] *Terms of Use*, PLANNED PARENTHOOD, https://www.plannedparenthood.org/terms-of-use (last visited June 9, 2026).

[15] *Privacy Notice*, PLANNED PARENTHOOD (Nov. 19, 2024), https://www.plannedparenthood.org/privacy-policy.

[16] *Privacy Notice*, PLANNED PARENTHOOD (Nov. 19, 2024), https://www.plannedparenthood.org/privacy-policy.

[17] *See, e.g.*, *HIPAA Privacy Policy*, PLANNED PARENTHOOD OF FLA. https://www.plannedparenthood.org/planned-parenthood-florida/hipaa (last visited June 9, 2026) ("The privacy and security provisions of [HIPAA] . . . require us to[] [m]ake sure that health information that identifies you is kept private."); *Privacy Policy*, PLANNED PARENTHOOD N.H. ACTION FUND (Nov. 2024), https://www.plannedparenthoodaction.org/planned-parenthood-new-hampshire-action-fund/privacy-policy (stating affiliates are HIPAA covered entities).

1.    **Federal Protections**

37.    As health care providers that furnishes diagnosis, treatment, and prescription services and that transmits health information in electronic form in connection with covered transactions, Planned Parenthood Florida, Planned Parenthood Tennessee, and Planned Parenthood Georgia are "covered entities" within the meaning of 45 C.F.R. § 160.103, and the individually identifiable health information they maintain concerning their patients  is Protected Health Information ("PHI") under the statute.

38.    When performing certain functions on behalf of its affiliates—such as processing patient or health plan member information—PPFA is a HIPAA "business associate" for its affiliates.

39.    The HIPAA Privacy Rule prohibits a covered entity and its business associates from using or disclosing PHI except as expressly permitted or required, and it specifically forbids the use or disclosure of PHI for marketing without a valid written authorization from the individual. *See* 45 C.F.R. §§ 164.502(a), 164.508(a)(3).

40.    A HIPAA-compliant authorization must be written in plain language and must specifically identify the information to be disclosed, the persons authorized to make and to receive the disclosure, and the purpose of the disclosure. *See* 45 C.F.R. § 164.508(c). A consumer's online acceptance of generalized terms of use does not satisfy these requirements.

41.    As described below, PPFA disclosed Plaintiffs' PHI—including information identifying Plaintiffs and revealing the reproductive- and sexual-health conditions for which they sought treatment—to Google for advertising purposes, without obtaining the specific authorization from Plaintiffs and putative class members that HIPAA requires and for a purpose that no HIPPA exception permits. The disclosure of identifying information together with the health care Plaintiffs

10

sought and received is precisely the impermissible disclosure of PHI that HIPAA's authorization requirement is designed to prevent.

42. Similarly, Planned Parenthood Florida, Planned Parenthood Tennessee, and Planned Parenthood Georgia—as HIPAA-covered entities—disclosed Plaintiffs' PHI to Google through their MyChart patient portal, myplannedparenthoodchart.org, without obtaining the specific authorization from Plaintiffs and putative class members that HIPAA requires and for a purpose that no HIPPA exception permits. The disclosure of that information, which revealed both the identity of the patient and the reproductive- or sexual-health services they sought from a covered entity, is precisely the impermissible disclosure of PHI that HIPAA's authorization requirement is designed to prevent.

## 2. California Protections

43. In 2020, California passed the California Privacy Rights Act, which expands the protections afforded by the California Consumer Privacy Act. This includes expanding the term "sensitive personal information" to include "[p]ersonal information collected and analyzed concerning a consumer's sex life or sexual orientation." Cal. Civ. Code § 1798.140(ae)(2)(C).

44. Further, reproductive health information is also protected by California's Confidentiality of Medical Information Act ("CMIA"), Cal. Civ. Code § 56.

45. The CMIA prohibits "[a] provider of health care . . . [from disclosing] medical information regarding a patient of the provider of health care . . . without first obtaining an authorization." Cal. Civ. Code § 56.10(a).

46. In a May 26, 2022 press release stressing "unprecedented threats to reproductive freedom," the California Attorney General opined that CMIA "applies to mobile apps that are designed to store medical information, including some fertility trackers, and establishes privacy

11

protections that go beyond federal law."[18] On January 1, 2024, AB 254 and AB 1697 formally

codified how the California Attorney General had already been interpreting and enforcing CMIA.

47.     Therefore, as an organization that offers a reproductive or sexual health digital

service, PPFA and its affiliates now certainly qualify as a "provider of health care" under CMIA.

*See* Cal. Civ. Code § 56.06(e).

48.     "Medical information" is defined as:

> [A]ny individually identifiable information, in electronic or physical form, in possession of or derived from a provider of health care, health care service plan, pharmaceutical company, or contractor regarding a patient's medical history, mental health application information, **reproductive or sexual health application information**, mental or physical condition, or treatment. "Individually identifiable" means that the medical information includes or contains any element of personal identifying information sufficient to allow identification of the individual, such as the patient's name, address, electronic mail address, telephone number, or social security number, or other information that, alone or in combination with other publicly available information, reveals the identity of the individual.

Cal. Civ. Code § 56.05(j) (emphasis added).

49.     "Reproductive or sexual health application information" is defined as:

> [I]nformation about a consumer's reproductive health, menstrual cycle, fertility, pregnancy, pregnancy outcome, plans to conceive, or type of sexual activity collected by a reproductive or sexual health digital service, including, but not limited to, information from which one can infer someone's pregnancy status, menstrual cycle, fertility, hormone levels, birth control use, sexual activity, or gender identity.

Cal. Civ. Code § 56.05(q).

---

[18] *Attorney General Bonta Emphasizes Health Apps' Legal Obligation to Protect Reproductive Health Information*, OAG (May 26, 2022), https://oag.ca.gov/news/press-releases/attorney-general-bonta-emphasizes-health-apps-legal-obligation-protect.

50.    Despite these legal and regulatory developments, Planned Parenthood fails to notify patients that it discloses their protected and confidential reproductive health information and fails to obtain required consent.

**B.    Planned Parenthood Tracks and Discloses Its Patients' Health Information to Third Parties**

51.    A website does more than display pages to the people who visit it. Its operator can add small pieces of computer code—known as pixels, tags, cookies, and software development kits ("SDKs")—that cause each visitor's own web browser to send a copy of what the visitor is doing to outside companies.[19] Operators add this code to show visitors advertising, to measure that advertising, to assemble audiences of users, and to follow visitors with ads after they leave the site.[20]

52.    The outside companies that receive this information keep a permanent identifier for each browser and use it to link together what that browser does across the many different websites that carry the company's code. Google's identifier is called the client identifier, or "cid"; Google reads it from a cookie named "_ga" that it places on every website running Google Analytics.[21]

---

[19] *See Lurking Beneath the Surface: Hidden Impacts of Pixel Tracking*, FED. TRADE COMM'N (Mar. 16, 2023), https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2023/03/lurking-beneath-surface-hidden-impacts-pixel-tracking; *see also Meta Pixel*, META FOR DEVELOPERS, https://developers.facebook.com/docs/meta-pixel/ (last visited June 14, 2026) (describing the Meta Pixel as "a snippet of JavaScript code that allows you to track visitor activity").

[20] *See About dynamic remarketing*, GOOGLE ADS HELP, https://support.google.com/google-ads/answer/3124536?hl=en (last visited June 14, 2026) (remarketing "allows you to show ads to customers who have previously visited your website"); *Conversion Tracking*, META FOR DEVELOPERS, https://developers.facebook.com/docs/meta-pixel/implementation/conversion-tracking/ (last visited June 14, 2026) (tracked conversions used to measure ad effectiveness and to define custom audiences).

[21] *See Cookie usage on websites (GA4)*, GOOGLE, ANALYTICS HELP, https://support.google.com/analytics/answer/11397207?hl=en (last visited June 14, 2026).

Meta (Facebook) keeps a similar identifier tied to the visitor's Facebook account.[22] When a website sends one of these companies a permanent identifier in the same message as something specific the visitor did—such as the web address of a page about a particular medical service—the company can connect that activity to that identified person.[23]

### 1.    Tracking on PPFA's Site

53.    Remarkably, PPFA's website is built so that a patient's act of booking a health service transmits that patient's booking activity to Google. When a patient accesses www.plannedparenthood.org, they arrive at the homepage depicted in **Figure 1**. The patient is immediately given the option to "Book an Appointment" or access "Telehealth."



**Figure 1:** Planned Parenthood's homepage as it appears to a patient upon accessing the website.

---

[22] *See Get Started*, Meta for Developers, https://developers.facebook.com/docs/meta-pixel/get-started/ (last visited June 14, 2026) (Facebook cookies "enable us to match your website visitors to their respective Facebook User accounts").

[23] *See, e.g.*, *Conversion Tracking*, Meta for Developers, https://developers.facebook.com/docs/meta-pixel/implementation/conversion-tracking/ (last visited June 14, 2026) ("PageView standard events record the referrer URL of the page that triggered the function call" which can be used "to define visitor actions that should be tracked").

54.     When the patient clicks "Book an Appointment," they are directed to https://www.plannedparenthood.org/health-center. As set forth in **Figure 2**, the patient is then prompted to find a health center by selecting a service, entering a location ("Zip, City, or State"), and choosing an appointment type ("All," "Telehealth," or "In-Person"). As set forth in **Figure 3**, when the patient opens the "Service" menu, they are presented with a list of specific service options to select from, including "Abortion," "Birth Control," "Emergency Contraception (Morning-After Pill)," "Gender-Affirming Care," "HIV Services," "Mental Health," "Pregnancy Testing and Planning," and "Prenatal and Postpartum Services."



**Figure 2:** The "Find a Health Center" page (https://www.plannedparenthood.org/health-center), where the patient selects a service, enters a location, and chooses an appointment type.
.

15



**Figure 3:** The "Select a service" dropdown, presenting the patient with the available service options.

55.     When a patient selects a service, enters a location, and clicks "Search," their browser instantly sends Google a single message describing that search. The message spells out the service the patient looked for and their ZIP code, and—on the abortion page—the patient's age and the first day of their last menstrual period. It also carries the cid, the permanent identifier Google uses to recognize the same browser everywhere it operates.

56.     Planned Parenthood conveys to Google exactly what the patient is doing. As shown in Figure 4(b), the site sorts the patient's information into its own labeled fields. When a patient seeks to book an abortion appointment, for example, a "service" field is set to "abortion," along with an "age" field and fields recording the date of the last menstrual period and the number of weeks since it occurred (a measure of how far along a pregnancy would be).

57.     Figures 4 and 5 capture one such message. The message travels in two parts: its web address (**Figure 4(a)**), which carries the cid and the search details, and its body (**Figure 4(b)**),

which repeats that information in the labeled fields described in paragraph 56 above. **Figure 5** is the server's own record of the message.

58.    The site is built to hide the fact that Planned Parenthood transmits patient information to third parties. The message is not addressed to Google; it is addressed to ppfa.plannedparenthood.org, an address on Planned Parenthood's own domain (Figure 4(a)), so that to anyone watching the traffic, the data appears never to leave Planned Parenthood. But the Planned Parenthood address is only a forwarding alias, because it resolves to a Google server (IP 35.244.165.123, Figure 5), and the message is in every other respect an ordinary Google Analytics transmission—the same delivery path (/g/collect), the same Google account tag (G-ENXC8KHJL8), and the same cookies that would otherwise go straight to Google. Routing it through a Planned Parenthood address changes how the disclosure looks, but not where the data goes or who receives it.

```
"request": {
  "method": "POST",
  "url": "https://ppfa.plannedparenthood.org/g/collect?v=2&tid=G-ENXC8KHJL8&gtm=45he6550h2v877549373z8861934708za20kzb861934708zd861934708&
  _p=1778085758885&gcs=G100&gcd=13p3pPp2p5ll&npa=1&dma_cps=-&dma=1&ecid=2142100916&_eu=EAAAAGA&_fplc=0&are=1&cid=1379704179.1778085760&frm=0&
  ir=1&pscdl=denied&rcb=14&sr=1440x960&uaa=x86&uab=64&uafvl=Google%2520Chrome%3B147.0.7727.138%7CNot.A%252FBrand%3B8.0.0.0%7CChromium%3B147.0.
  7727.138&uam=&uamb=0&uap=Windows&uapv=15.0.0&uaw=0&ul=en-us&ur=&sst.rnd=1751411109.1778085760&sst.tft=1778085758885&sst.lpc=77219796&sst.
  navt=n&sst.ude=0&gaf=2&_s=3&tag_exp=0~115616986~115938465~115938468~118289195~118463262~118690341~1188121177&sid=1778085759&sct=1&seg=0&
  dl=https%3A%2F%2Fwww.plannedparenthood.
  org%2Fabortion-access%3Fage%3D19%26location%3DMiami%2BGardens%252C%2BFL%2B33014%26lmp%3D2026-4-6%26entryForm%3Dtrue&dr=https%3A%2F%2Fwww.
  plannedparenthood.org%2Fhealth-center&dt=Where%20to%20Get%20an%20Abortion%20%7C%20Find%20Abortion%20Services%20Near%20You&_tu=BAg&tfd=1434&
  richsstsse",
  "httpVersion": "h3",
  "headers": [
    {
      "name": ":authority",
      "value": "ppfa.plannedparenthood.org"
```

**Figure 4(a):** The web address of the message the Planned Parenthood website sends to Google the moment an abortion patient clicks "Search" after selecting an option in Service and Zip, City or State. The permanent browser identifier (cid=1379704179.1778085760) is transmitted together with the visitor's age (age%3D19), location (location%3DMiami%2BGardens), ZIP (2B33014%), last-menstrual-period date (lmp$3D2026-4-6), and the service searched (abortion-access).

```
"cookies": [],
"headersSize": -1,
"bodySize": 2633,
"postData": {
    "mimeType": "text/plain;charset=UTF-8",
    "text": "en=Searched%20for%20Health%20Centers&_c=1&gap.gtb=2&ep.address=Miami%20Gardens%2C%20FL%2033014&ep.affiliate_id=(not%20set)&ep.
    affiliate_name=(not%20set)&ep.appointment_type=(not%20set)&epn.browser_timestamp=13&ep.click_element_url_path=%2Fabortion-access&ep.
    cms_component_name=(not%20set)&ep.cms_component_type=(not%20set)&ep.cms_template_type=Get%20Care%20Page&ep.directed_non=(not%20set)&ep.
    document_referrer=https%3A%2F%2Fwww.plannedparenthood.org%2Fhealth-center&ep.
    document_title=Where%20to%20Get%20an%20Abortion%20%7C%20Find%20Abortion%20Services%20Near%20You&ep.facility_type=(not%20set)&ep.
    filter_distance=(not%20set)&ep.gift_amount=(not%20set)&ep.gift_amount_type=(not%20set)&ep.gift_frequency=(not%20set)&ep.gift_type=
    (not%20set)&ep.gtm_container_id=GTM-TQCVD6D&ep.gtm_container_version=243&ep.gtm_environment_name=&ep.
    gtm_event=entry%20form%20search%20results&epn.gtm_unique_event_id=13&ep.has_datacontext=false&ep.hc_search_page=(not%20set)&ep.
    health_center_facility_id=&ep.health_center_name=(not%20set)&ep.health_center_service_page=&ep.health_center_type=(not%20set)&ep.
    is_debug_mode=false&ep.is_filter_appointment_type=false&ep.is_filter_distance=false&ep.is_filter_service=false&ep.
    is_notsure_lmp_checked=unchecked&ep.lp_mmdd=468&epn.lp_weeks=4&ep.number_of_search_results=&ep.page_category_level_1=ASL%20Search%20Results&
    ep.page_category_level_2=&ep.page_category_level_3=&ep.page_category_level_4=&ep.page_category_level_5=&ep.page_category_level_6=&ep.
    page_in_iframe=Not%20Iframe&ep.page_language=English&epn.page_load_id=1778085758127&ep.page_number=(not%20set)&ep.page_subtopic=&epn.
    page_tier=1&ep.page_topic=&ep.page_type=ASL%20Search%20Results%20Page&ep.payment_method=(not%20set)&ep.recurring_or_onetime=One-Time&ep.
    referring_donation_widget=(not%20set)&ep.referring_search_widget=currentprod&ep.render_type=(not%20set)&ep.screen_size=1440x912&ep.
    search_plugin_type=currentprod&ep.search_results_count=(not%20set)&ep.search_results_page=(not%20set)&ep.search_results_type=zip%20code&ep.
    service=abortion&ep.service_type=abortion&ep.site_environment=PROD&ep.test_id_and_name=%3B%20&ep.test_variation_id_and_name=%3B%20&ep.
    zastatus=(not%20set)&ep.business_entity=Abortion%20Search%20Locator&ep.module_type=(not%20set)&ep.user_type=(not%20set)&ep.age=19&ep.
    gtm_tag_name=GA4%20-%20ASL%20-%20Searched%20for%20Health%20Centers&ep.count_searched_for_health_center=1&ep.
    count_asl_searched_for_health_center=1&ep.
    event_context=User%20Searched%20for%20Health%20Centers%20and%20were%20Presented%20with%20Results%20in%20ASL&ep.
    asl_app_section=search%20results&ep.form_type=asl%20health%20center%20search%20entrypoint&_et=1"
}
```

**Figure 4(b):** Here the site repeats the patient's information in its own labeled fields—including a "service" field set to "abortion," (ep.service=abortion), an "age" field set to "19" (ep.age=19), and fields for the date of the last menstrual period and the number of weeks since (here, 4) (epn.lp_weeks=4). The site labels the tool itself the "Abortion Search Locator" (business_entity=Abortion%Search%20Locator).

```
"_transferSize": 83,
"_error": null,
"_fetchedViaServiceWorker": false
},
"serverIPAddress": "35.244.165.123",
"startedDateTime": "2026-05-06T16:42:39.553Z",
"time": 77.48000000719912,
"timings": {
    "blocked": 0.8309999977070839,
```

**Figure 5:** The server record for the same captured message, showing that the Planned Parenthood-branded address ppfa.plannedparenthood.org is connected to 35.244.165.123—an IP address that public registration records identify as belonging to Google.[24]

---

[24] Public ARIN/WHOIS records identify 35.244.165.123 as part of Google LLC's GOOGLE-CLOUD allocation. *See* https://whois.arin.net/rest/ip/35.244.165.123?s=35.244.165.123.

## 2. Tracking on Planned Parenthood Affiliates' Site

59. Once a patient selects a service, enters a location, and clicks "Search," the site returns a list of nearby providers offering the selected service. As shown in **Figure 6**, each result is a health center operated by a Planned Parenthood affiliate—here, Planned Parenthood of Florida and Planned Parenthood Direct—and each gives the patient a way to book, whether online ("Book Online") or by message ("Get Care Now")



**Figure 6:** The results page for a "Birth control" search in ZIP 33014, listing nearby providers. Each is operated by a Planned Parenthood affiliate—here, Planned Parenthood of Florida and Planned Parenthood Direct—and each offers the patient a way to book, online or by message.

19

60.    For patients located in Florida, Georgia, or Tennessee, clicking "Book Online" after selecting a provider redirects them to Planned Parenthood's online scheduling system, which operates on the Epic MyChart platform. As shown in **Figure 7**, that page asks the patient to choose the specific service they wish to be seen for—again including "Abortion," alongside options such as "Birth Control," "Emergency Contraception," and "STI/STD Screening & Treatment."



**Figure 7:** Planned Parenthood's MyChart scheduling page, reached after the patient clicks "Book Online." The patient is asked to select the specific service they wish to be seen for, including "Abortion."

61.    The tracking that followed the patient on PPFA's site also follows the patient into the MyChart booking process. The MyChart page loads the same tracking code and sends Google messages carrying the same cid Google permanent identifier that PPFA's site assigned during the patient's earlier search—such that the person who sought a service on PPFA's site and the person now on MyChart are identified together as one.

###### C.     Planned Parenthood Patients Did Not Consent to the Tracking and Disclosures in Question

###### 1.     Consent Banner, Terms of Use, and Privacy Notice

62.     PPFA installed the cookie-consent banner shown in **Figure 8** on or around March 29, 2024, and has since displayed it to every user upon arrival at plannedparenthood.org.

**This website uses cookies**

Planned Parenthood cares about your healthcare privacy and information preferences. We and our third-party vendors use cookies and other tools to collect, store, monitor, and analyze information about your interaction with our site, to improve performance, analyze your use of our sites and assist in our marketing efforts. We also use analytics to better understand how users book appointments. You may edit the use of these cookies and other tools at any time by visiting Cookie Settings. By clicking "Allow All Cookies" you consent to our collection and use of such data, and our Terms of Use . For more information, see our Privacy Notice .

**Cookie settings**     **ALLOW ALL**

**Español**

**Figure 8:** PPFA's cookie-consent banner. The only affirmative control on the face of the banner is "Allow All"; refusing requires opening the separate "Cookie settings" menu, where the Marketing, Performance, and Analytics categories are pre-set to "On."

63.     The banner says that by clicking "Allow All," the user consents to PPFA's "collection and use" of certain data. It also says, "For more information, see our Privacy Notice."

64.     The Privacy Notice claims to cover some data practices. Its "Ad Networks and Advertising Partners" and "Third-Party Data Collection and Online Advertising" sections tell users that PPFA works with ad networks and advertising partners that "may collect information directly from a browser or device when an individual visits our Services through cookies or other data collection technologies," and that this information is "used to provide and inform targeted advertising, as well as to provide advertising-related services such as reporting, attribution, analytics and market research."[25]

65.     The information the Notice describes is the device- and browser-level data that tracking technologies gather automatically—"IP address," "device type/model/manufacturer," "a

---

[25] *Privacy Notice*, PLANNED PARENTHOOD (Nov. 19, 2024), https://www.plannedparenthood.org/privacy-policy.

unique ID," and a record of "the pages you visit" and "the links you click."[26] In other words, the Privacy Notice asks users to accept cookie-based tracking of their general browsing, in exchange for a more personalized site and PPFA's advertising and analytics.

66.    For the most part, the Terms of Use read like any ordinary online terms. They assert PPFA's copyright in the site, disclaim warranties, select New York law, and a New York forum, and set out "User Rules" for what a visitor may post or transmit.[27] Almost none of it addresses what PPFA does with the information a visitor provides.

67.    The one provision in the Terms that speaks to how PPFA will treat user information is Section 7(g). Section 7(g) states:

> It is our general policy to protect the privacy of the persons transmitting any messages to PPFA. However, PPFA reserves the right to reproduce and distribute part or all of a message without any compensation to the User so long as any identifying information is deleted.[28]

### 2.    Plaintiffs C.B. and L.M. Never Saw a Consent Banner, and Plaintiff D.D. Selected "Reject All"

68.    Plaintiff C.B. used plannedparenthood.org to research reproductive-health information and to book appointments in 2022 and 2023. Plaintiff L.M. did the same in 2021. Because PPFA installed the banner on or around March 29, 2024, when Plaintiffs C.B. and L.M. used the site, no banner appeared—and no consent could have been obtained.

69.    Plaintiff D.D. used plannedparenthood.org to research reproductive-health information and to book appointments in or around September 2025 and February 2026. When presented with the banner, Plaintiff D.D. selected "Cookie Settings" before proceeding to select "Reject All" in the popup set forth as **Figure 9**.

---

[26] *Id*.

[27] *Terms of Use*, PLANNED PARENTHOOD, https://www.plannedparenthood.org/terms-of-use (last visited June 9, 2026).

[28] *Id*.



**Figure 9:** PPFA's "Cookie Settings" panel—reached only after clicking the "Cookie settings" link—showing the Marketing, Performance, and Analytics toggles preset to "On" and the "Reject All," "Save Settings," and "Allow All" controls.

70.    (In the end, a user's "Reject All" or "Allow All" selection is something of a red herring. The allegations in paragraphs 55–61 remain essentially unchanged—and do not depend on—any banner choice. In other words, the persistent Google cid identifier reaches Google whether a user clicks "Allow All," clicks "Reject All," or never engages the banner at all.)

### 3.    Any Consent Obtained from the Remainder of the Class Was Ineffective

71.    For several reasons, even for patients who were shown PPFA's cookie-consent banner and clicked "Allow All," PPFA failed to obtain valid consent to the tracking and disclosures at issue.

72.    For starters, by the banner's terms, Clicking "Allow All" signifies consent to only two things: data collection and use, and the Terms of Use. The banner never asks users to agree to the Privacy Notice; it only links to it. So whatever the banner captures, it is not consent to the Privacy Notice—and what it does capture does not reach the conduct at issue. The banner's

23

described "data" is generic: cookies for performance and marketing—not the disclosure of a patient's chosen service, ZIP code, age, and last-menstrual-period date to advertisers.

73.    By its terms, the Privacy Notice "is not a contract and does not create any legal rights or obligations not otherwise provided by law."[29]

74.    At most, then, patients consented to the Terms of Use which, as described, promises that although PPFA may reproduce or distribute a user's message, it will do so only "so long as any identifying information is deleted."[30] In transmitting its patients' cid persistent identifier to Google as described in paragraphs 55, 57, and Figure 4(a), PPFA breached such a promise.

75.    In addition, the Privacy Notice explicitly tells patients that their health information is off-limits. The Notice says that PPFA acts as a HIPAA "service provider" to its Affiliates, handles such data under "HIPAA business associate agreements," and treats as protected "patient or health plan member information that you provided to Affiliates or related entities to obtain pharmacy, medical, or healthcare or health plan services online or in person."[31] It then says, in bold, "**This Privacy Notice does *not* apply to our processing of such information**," and that the information "is protected by state and federal law."[32]

76.    As alleged in paragraphs 59–61, the same Google tracking that runs on PPFA's booking tool follows the patient into the Affiliate's MyChart scheduler at myplannedparenthoodchart.org, carrying the same persistent cid identifier which PPFA assigned during the patients' use of the booking tool on PPFA's site. Such tracking breaches the Privacy

---

[29] *Privacy Notice*, PLANNED PARENTHOOD (Nov. 19, 2024), https://www.plannedparenthood.org/privacy-policy.

[30] *Terms of Use*, PLANNED PARENTHOOD, https://www.plannedparenthood.org/terms-of-use (last visited June 9, 2026).

[31] *Privacy Notice*, PLANNED PARENTHOOD (Nov. 19, 2024), https://www.plannedparenthood.org/privacy-policy.

[32] *Id*. (emphasis in italics added).

Notice's representation that state and federal law, and not the Privacy Notice, covers such transactions.

77.    As alleged in paragraphs 37–38, the Planned Parenthood Affiliates are HIPAA "covered entities" and PPFA is their "business associate." The booking information a patient supplies—for example, her chosen service, ZIP code, age, and last-menstrual-period date—is PHI under HIPAA.

78.    HIPAA prohibits covered entities and their business associates from using or disclosing PHI for marketing without a valid written authorization. 45 C.F.R. §§ 164.502(a), 164.508(a)(3). Such authorization must be in plain language and must specifically identify the information disclosed, the persons authorized to make and receive the disclosure, and its purpose. 45 C.F.R. § 164.508(c).

79.    A cookie banner or generalized privacy notice like those set forth on PPFA's site does not satisfy those requirements. Whatever PPFA's documents secured, it was not the authorization HIPAA demands before PHI may be handed to third parties for advertising.

80.    Because HIPAA renders the kinds of disclosures alleged here criminal, 42 U.S.C. § 1320d-6, no agreement PPFA could point to would make them lawful. *See, e.g.*, 18 U.S.C. § 2511(2)(d) (consent is no defense where a communication is intercepted in order to commit a criminal or tortious act).

### 4.    <u>Additional California-Specific Statutes Render Consent Ineffective</u>

81.    As alleged above in paragraphs 43–49, PPFA and its Affiliates are "provider[s] of health care" under the CMIA, and the information disclosed to Google—revealing the reproductive- and sexual-health services a patient sought—is "medical information" and "reproductive or sexual health application information" within the statute's scope. Cal. Civ. Code

§ 56.06(b), (e). PPFA disclosed that information to Google, without the authorization the CMIA requires, in violation of Cal. Civ. Code §§ 56.10 and 56.11.

82.     The knowing use of medical information for a purpose unrelated to a patient's care—here, advertising and profit—is not only a civil wrong but a crime. Cal. Civ. Code § 56.36(a), (c)(3)(A), (c)(5). Because the disclosures alleged here were criminal, no agreement PPFA could point to would make them lawful. *See, e.g.*, Cal. Civ. Code § 1668 (a contract that exempts a party from responsibility for a violation of law is void).

83.     Finally, the California Consumer Privacy Act gives consumers more control over the personal information that businesses collect about them. Under the CCPA, consent cannot be obtained by way of a "dark pattern": "a user interface designed or manipulated with the substantial effect of subverting or impairing user autonomy, decisionmaking, or choice." Cal. Civ. Code § 1798.140(h), (l).

84.     In PPFA's cookie-consent banner, "Allow All" is a large, brand-colored button. *See* Figure 8, *supra*. There is no "Reject All" button on the banner itself, so the only way to refuse is to open the separate "Cookie settings" menu. *Id*. Inside that menu, the Marketing, Performance (session replay), and Analytics categories are all switched "On" by default, so a user who clicks "Allow All," or who does nothing, is treated as having agreed to all of them.

85.     Because it constitutes a "dark pattern" under the CCPA, PPFA's cookie-consent banner cannot establish patient consent.

## TOLLING

86.     Any applicable statute of limitations has been tolled by the "delayed discovery" rule. Plaintiffs did not know (and had no way of knowing) that their health information was intercepted and unlawfully disclosed to third parties because Defendants kept this information

26

secret. Alternatively, applicable statutes of limitations have been tolled by other applicable rules or doctrines.

87.    Any applicable statutes of limitations has been tolled by Defendants' knowing and active concealment of its interception and recording of legally protected information.

88.    PPFA's tracking and transmission of patient information to Google, discussed *supra*, was and is entirely invisible to a website visitor.

89.    Through no fault or lack of diligence, Plaintiffs and Class members were deceived and could not reasonably discover Defendants' deception and unlawful conduct.

90.    Plaintiffs were ignorant of the information essential to pursue their claims, without any fault or lack of diligence on their part.

91.    Defendants had exclusive knowledge that tracking technologies were incorporated into PPFA's website and yet failed to disclose to its patients, including Plaintiffs and Class members, that by making medical appointments through such site, Plaintiffs' and Class members' health information would be intercepted and recorded by Google for targeted advertising.

92.    Under the circumstances, Defendants were under a duty to disclose the nature, significance, and consequences of its collection of its patients' health information. In fact, to the present, Defendants have not conceded, acknowledged, or otherwise indicated to its patients that they unlawfully intercepted and recorded their health information. Accordingly, Defendants are estopped from relying on any statute of limitations.

93.    Moreover, all applicable statutes of limitations have also been tolled pursuant to the discovery rule.

27

94.    The earliest that Plaintiffs or Class members, acting with due diligence, could have reasonably discovered Defendants' conduct would have been shortly before the filing of the Plaintiffs' complaint in this matter.

95.    Plaintiffs first discovered that Defendants had intercepted, recorded, and transmitted their private information after contacting undersigned counsel and discussing potential claims against Defendants.

## CLASS ACTION ALLEGATIONS

96.    Plaintiffs bring this Action pursuant to Federal Rule of Civil Procedure 23, individually and on behalf of the following Class:

> **Nationwide Class**.  All natural persons in the United States who accessed and booked an appointment on the site www.plannedparenthood.org and whose appointment-related information was collected and relayed to third parties by embedded tracking technologies.

97.    Plaintiffs also plead the following subclass:

> **No-Consent Banner Subclass**.  All natural persons in the United States who accessed and booked an appointment on the site www.plannedparenthood.org, whose appointment-related information was collected and relayed to third parties by embedded tracking technologies, and who have never clicked "Accept All" on the cookie-consent banner in Figure 8.

98.    Plaintiffs C.B. and L.M. also plead the following subclass:

> **HIPAA Subclass**.  All natural persons in the United States who used the MyChart booking system at myplannedparenthoodchart.org, or an equivalent booking system, to book an appointment with a Planned Parenthood health center operated by a Planned Parenthood Affiliate and whose protected health information was transmitted to third parties via tracking technologies.

99.    Plaintiff C.B. pleads the following subclass:

> **Florida Subclass**. All natural persons in the State of Florida who accessed and booked an appointment on the site www.plannedparenthood.org and whose appointment-related information was collected and relayed to third parties by embedded tracking technologies.

100.    Plaintiff D.D. pleads the following subclass:

**California Subclass**.  All natural persons in the State of California who accessed and booked an appointment on the site www.plannedparenthood.org and whose appointment-related information was collected and relayed to third parties by embedded tracking technologies.

101.    Plaintiff D.D. pleads the following subclass:

**"Reject All" Banner Subclass**. All natural persons in the United States who accessed and booked an appointment on the site www.plannedparenthood.org, whose appointment-related information was collected and relayed to third parties by embedded tracking technologies, and who clicked "Reject All" on the cookie-consent banner in Figure 9.

102.    The Nationwide Class, California Subclass, and Florida Subclass, are referred to in this Section together as the "Class."

103.    Excluded from the Class are: (1) any Judge or Magistrate presiding over this action and any members of their immediate families; (2) the Defendants, Defendants' subsidiaries, affiliates, parents, successors, predecessors, and any entity in which the Defendants or its parents have a controlling interest and their current or former employees, officers, and directors; and (3) Plaintiffs' counsel and Defendants' counsel.

104.    **Numerosity.** The exact number of members of the Class is unknown and unavailable to Plaintiffs at this time, but individual joinder in this case is impracticable. The Class likely consists of hundreds of thousands of individuals, and the members can be identified through Defendants' records.

105.    **Typicality.** Plaintiffs' claims are typical of the claims of the other members of the Class and arise from the same conduct by Defendant and are based on the same legal theories.

106.    **Adequate Representation.** Plaintiffs have and will continue to fairly and adequately represent and protect the interests of the Class. Plaintiffs have retained counsel

29

competent and experienced in complex litigation and class actions, including litigations to remedy privacy violations. Plaintiffs have no interest that is antagonistic to the interests of the Class, and Defendant has no defenses unique to the Plaintiffs. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the members of the Class, and they have the resources to do so. Neither Plaintiffs nor their counsel have any interest adverse to the interests of the other members of the Class.

107. **Commonality and Predominance.** The Class's claims present common questions of law and fact, and those questions predominate over any questions that may affect individual Class members. Common questions for the Class include, but are not limited to, the following:

a. whether PPFA embedded tracking technologies on plannedparenthood.org that disclosed Class members' communications and personal information to third parties;

b. whether PPFA's Terms of Use, Privacy Notice, and cookie banner, individually or together, secure valid consent to the conduct alleged;

c. whether PPFA's representations regarding HIPAA-covered information at affiliate health centers are false or materially misleading in light of the Affiliates' instrumentation of its MyChart deployment with tracking technologies;

d. whether Defendants' conduct violates the federal Electronic Communications Privacy Act;

e. whether Defendants' conduct violates the California Confidentiality of Medical Information Act;

f. whether Defendants' conduct violates the Florida Security of Communications Act;

g.  whether Defendants' conduct constitutes a deceptive act or practice under N.Y. General Business Law § 349; and

h.  the appropriate scope and form of declaratory, injunctive, and monetary relief.

108.  **Superiority.** This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy and joinder of all members of the Class is impracticable.  This proposed class action presents fewer management difficulties than individual litigation, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.  Class treatment will create economies of time, effort, and expense and promote uniform decision-making.

109.  Plaintiff reserves the right to revise the foregoing class allegations and definitions based on facts learned and legal developments following additional investigation, discovery, or otherwise.

## CAUSES OF ACTION

### COUNT I
### VIOLATIONS OF NEW YORK GENERAL BUSINESS LAW § 349
**(All Plaintiffs Against PPFA, on behalf of the Nationwide Class)**

110.  Plaintiffs re-allege and incorporate by reference the preceding paragraphs as if fully set forth herein, and bring this Count individually and on behalf of the Nationwide Class against PPFA.

111.  Section 349(a) of the New York General Business Law ("GBL § 349") prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state." Section 349 has been construed to provide a private right of action to any person who has been injured by reason of a deceptive act or practice.

31

112. PPFA conducts business in New York, including the operation of plannedparenthood.org, from its headquarters at 123 William Street, New York, New York. The deceptive acts and practices alleged in this Complaint arose from PPFA's New York headquarters. PPFA's deceptive acts and practices are therefore subject to GBL § 349.

113. PPFA engaged in deceptive acts and practices likely to mislead reasonable consumers, including:

   a. Representing in the Terms of Use that PPFA "reserves the right to reproduce and distribute part or all of a message . . . only . . . so long as any identifying information is deleted," while in fact bundling identifying information (including Google's cid permanent identifier) with reproductions of the user's communications and transmitting them to third parties;

   b. Representing in the Privacy Notice that "patient or health plan member information provided to Planned Parenthood Affiliates to obtain pharmacy, medical, or healthcare services" is protected by federal and state law, while in fact delivering patients in Florida, Tennessee, Georgia, and various other states into a MyChart booking system that is itself instrumented with third-party trackers in violation of HIPAA;

   c. Routing PPFA's Google Analytics 4 traffic through ppfa.plannedparenthood.org, a Planned Parenthood-branded subdomain that masks the Google destination of the traffic; and

   d. Designing a cookie-consent banner that visually emphasizes the "Allow All" option and hides a "Reject All" option.

32

114.    PPFA's acts and practices are also unfair in that they are immoral, unethical, oppressive, and unscrupulous, and substantially injurious to consumers; and the harm they cause is not outweighed by any countervailing benefit to consumers or to competition.

115.    PPFA's deceptive and unfair acts and practices caused injury to Plaintiffs and Class members, including but not limited to invasion of privacy, diminution in the value of personal information, and loss of the benefit of their bargain.

116.    Plaintiffs and Class members are entitled to actual damages, statutory damages of $50 per violation, treble damages where appropriate, attorneys' fees, and injunctive relief under GBL § 349(h).

**<u>COUNT II</u>**
**VIOLATIONS OF NEW YORK GENERAL BUSINESS LAW § 349**
**(Plaintiff D.D. Against PPFA, on behalf of the "Reject All" Banner Subclass)**

117.    Plaintiff D.D. re-alleges and incorporates by reference the preceding paragraphs as if fully set forth herein, and brings this Count individually and on behalf of the "Reject All" Banner Subclass against PPFA.

118.    Section 349(a) of the New York General Business Law ("GBL § 349") prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state." Section 349 has been construed to provide a private right of action to any person who has been injured by reason of a deceptive act or practice.

119.    PPFA conducts business in New York, including the operation of plannedparenthood.org, from its headquarters at 123 William Street, New York, New York. The deceptive acts and practices alleged in this Count arose from PPFA's New York headquarters. PPFA's deceptive acts and practices are therefore subject to GBL § 349.

33

120. PPFA's cookie-consent mechanism presents users with a control labeled "Reject All." By presenting and labeling that control as it did, PPFA represented to a reasonable consumer that selecting "Reject All" would reject—that is, prevent—the collection of the user's information and its disclosure to the third parties described in the banner. A reasonable consumer who located and clicked "Reject All" would understand that they had declined, and would not be subject to, any tracking and data-sharing whatsoever.

121. That representation was false and materially misleading. A member of the "Reject All" Banner Subclass who selected "Reject All" was subjected to precisely the same conduct as a user who clicked "Allow All" or who never engaged the banner at all: the moment the user searched for and booked a reproductive-health service, their browser transmitted to Google the service they sought, their ZIP code and age, and—for abortion patients—the date of their last menstrual period, all bundled with the persistent Google cid identifier that links that activity to the identified user.

122. The "Reject All" deception was material to Plaintiff D.D. and the "Reject All" Banner Subclass. Had they known that selecting "Reject All" did not stop the transmission of their reproductive-health information to Google, they would not have used plannedparenthood.org to research and book reproductive-health care, or would have taken other measures to protect their information.

123. PPFA's acts and practices are also unfair in that they are immoral, unethical, oppressive, and unscrupulous, and substantially injurious to consumers; and the harm they cause is not outweighed by any countervailing benefit to consumers or to competition.

34

124. PPFA's deceptive and unfair acts and practices caused injury to Plaintiff D.D. and "Reject All" Banner Subclass members, including but not limited to invasion of privacy, diminution in the value of personal information, and loss of the benefit of their bargain.

125. Plaintiff D.D. and "Reject All" Banner Subclass members are entitled to actual damages, statutory damages of $50 per violation, treble damages where appropriate, attorneys' fees, and injunctive relief under GBL § 349(h).

**COUNT III**
**BREACH OF IMPLIED CONTRACT**
**(Plaintiffs Against PPFA, on behalf of the No-Consent Banner Subclass)**

126. Plaintiffs re-allege and incorporate by reference the preceding paragraphs as if fully set forth herein, and brings this Count individually and on behalf of the No-Consent Banner Subclass against PPFA.

127. As a condition of using plannedparenthood.org to research reproductive-health information and to book appointments with Planned Parenthood health centers, Plaintiffs C.B., L.M., and D.D., and No-Consent Banner Subclass members were required to, and did, provide PPFA with their sensitive personal and health information—including the specific reproductive- or sexual-health service they sought, their ZIP code, their age, and, for abortion patients, the date of their last menstrual period.

128. When Plaintiffs C.B., L.M., and D.D., and No-Consent Banner Subclass members provided that information to PPFA, they entered into an implied contract under which PPFA agreed to safeguard their information and not to disclose it to third parties without authorization.

129. That implied contract arose from the nature of the provider–patient and putative provider–patient relationship; from PPFA's solicitation of patients through a website it operates and markets as "America's Most Trusted Name in Sexual Health®"; from PPFA's repeated

35

representations that its patients' privacy is protected; and from the web of federal and state laws governing the handling of reproductive-health information, including HIPAA and the CMIA.

130. By its conduct, PPFA communicated to Plaintiffs C.B., L.M., and D.D., and No-Consent Banner Subclass members that it would keep their information confidential and would not disclose it to third parties for advertising or other commercial purposes without their consent.

131. Plaintiffs C.B., L.M., and D.D., and No-Consent Banner Subclass members accepted that undertaking and performed their obligations by providing their information to PPFA and, where applicable, by paying for or arranging to pay for the care they sought.

132. Plaintiffs C.B., L.M., and D.D., and No-Consent Banner Subclass members would not have entrusted PPFA with their sensitive personal and health information, and would not have used plannedparenthood.org to research and book reproductive-health care, in the absence of an implied contract obligating PPFA to safeguard that information and not to disclose it without authorization.

133. Implied within that contract was a covenant of good faith and fair dealing, obligating PPFA to act in good faith and deal fairly with respect to the information entrusted to it.

134. PPFA breached the implied contract. As alleged above, PPFA embedded tracking technologies on plannedparenthood.org that, the moment a patient searched for and booked a service, transmitted to Google the service the patient sought, the patient's ZIP code and age, and—for abortion patients—the date of their last menstrual period, all bundled with the persistent Google cid identifier that links that activity to the identified patient. PPFA never obtained the authorization necessary to disclose that information.

135. Because PPFA did not install its cookie-consent banner until on or around March 29, 2024, no banner appeared when Plaintiffs C.B. and L.M. and No-Consent Banner Subclass

36

members used the site, and they never assented to any express terms purporting to authorize the disclosures at issue. PPFA's disclosures were therefore made without consent and in breach of the implied contract.

136. Because Plaintiff D.D. selected "Reject All" when presented with PPFA's cookie-consent banner, Plaintiff D.D. and No-Consent Banner Subclass members never assented to any express terms purporting to authorize the disclosures at issue. PPFA's disclosures were therefore made without consent and in breach of the implied contract.

137. As a direct and proximate result of PPFA's breaches, Plaintiffs C.B., L.M, and D.D.. and No-Consent Banner Subclass members have suffered damages, including invasion of privacy, diminution in the value of their personal information, loss of control over their communications and information, and the loss of the benefit of their bargain. Plaintiffs C.B., L.M., and D.D. and No-Consent Banner Subclass members are entitled to compensatory and consequential damages, nominal damages, and injunctive relief.

**COUNT IV**
**BREACH OF CONFIDENCE**
**(All Plaintiffs Against All Defendants, on behalf of the Nationwide Class)**

138. Plaintiffs re-allege and incorporate by reference the preceding paragraphs as if fully set forth herein, and bring this Count individually and on behalf of the Nationwide Class against all Defendants.

139. Healthcare providers, and entities that hold themselves out as facilitating access to healthcare, owe their patients and potential patients a duty to keep non-public medical information confidential.

140. That duty arises from the nature of the provider-patient (and putative provider-patient) relationship; from express and implied undertakings of confidentiality; and from the web

of federal and state laws governing the handling of medical information, including HIPAA, the CMIA, and parallel state laws.

141.    PPFA is among the largest, oldest, and best-known reproductive-health organizations in the United States. PPFA holds itself out to patients as a confidential portal to reproductive health care, and operates plannedparenthood.org as a federation-wide entry point into care provided by HIPAA-covered affiliates.

142.    PPFA's Privacy Notice and Terms of Use convey, both expressly and by implication, that the information patients submit to PPFA in connection with their reproductive-health inquiries will be kept confidential.

143.    The Affiliate Defendants—Planned Parenthood Florida, Planned Parenthood Tennessee, and Planned Parenthood Georgia—are HIPAA-covered healthcare providers that independently owe duties of confidentiality to the patients they serve and that reinforced those duties by operating a patient portal, myplannedparenthoodchart.org, into which patients were directed after initiating their booking on PPFA's site.

144.    Plaintiffs and Class members had reasonable expectations of confidentiality in their interactions with Defendants' websites—reasonable because of the highly sensitive nature of the reproductive-health information at issue, because of Defendants' express assurances of confidentiality, and because of the extensive legal framework protecting such information.

145.    Contrary to their duties of confidentiality, and contrary to their express undertakings, Defendants disclosed Plaintiffs' and Class members' communications and personal information to third parties. PPFA did so through tracking technologies embedded on plannedparenthood.org; the Affiliate Defendants did so through tracking technologies embedded

on their MyChart patient portal, which carried the same persistent Google identifier assigned to the patient during the earlier booking flow on PPFA's site.

146.    Defendants' breaches of confidence have caused, and continue to cause, concrete harm to Plaintiffs and Class members, including invasion of privacy, diminution in the value of their personal information, loss of control over the contents of their communications, and the loss of the benefit of their bargain with Defendants.

147.    Plaintiffs and Class members are entitled to compensatory damages, disgorgement of the profits Defendants derived from their breaches, nominal damages, punitive damages, and injunctive relief.

**<u>COUNT V</u>**
**VIOLATIONS OF THE ELECTRONIC COMMUNICATIONS PRIVACY ACT, 18 U.S.C. § 2510**
**(Plaintiffs C.B. and L.M. Against all Defendants, on behalf of the HIPAA Subclass)**

148.    Plaintiffs C.B. and L.M. re-allege and incorporate by reference the preceding paragraphs as if fully set forth herein, and bring this Count individually and on behalf of the HIPAA Subclass against all Defendants.

149.    Planned Parenthood Florida, Planned Parenthood Tennessee, and Planned Parenthood Georgia are HIPAA-covered entities. PPFA is a HIPAA business associate to these entities.

150.    The Electronic Communications Privacy Act ("ECPA") prohibits the intentional interception, disclosure, or use of any electronic communication. 18 U.S.C. § 2511(1). The ECPA provides a private right of action to any person whose electronic communications are intercepted, disclosed, or intentionally used in violation of the Act. 18 U.S.C. § 2520.

151.    Plaintiffs C.B. and L.M.'s and HIPAA Subclass members' navigations to plannedparenthood.org and myplannedparenthoodchart.org—including the URLs they navigated

39

to, the dropdown selections they made for service type, the ZIP codes they entered, and the form-field inputs they submitted—are "electronic communications" within the meaning of 18 U.S.C. § 2510(12).

152.   **Contents.** The contents of those electronic communications—as set forth in 18 U.S.C. § 2510(8), "any information concerning the substance, purport, or meaning of that communication"—included the specific service the patient selected (for example, "Abortion," "Birth Control," or "STI/STD Screening & Treatment"), the patient's ZIP code and age, and, for abortion patients, the date of their last menstrual period.

153.   **Interception.** The ECPA defines "intercept" as the "acquisition of the contents of any . . . electronic . . . communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4). The tracking technologies described herein acquired the contents of Plaintiffs' communications contemporaneously with their transmission.

154.   The tracking technologies embedded on PPFA's website and on the Planned Parenthood Affiliates' MyChart pages are "electronic, mechanical, or other device[s]" within the meaning of 18 U.S.C. § 2510(5). The following constitute "devices" within the meaning of § 2510(5): (a) Plaintiffs' and HIPAA Subclass members' web browsers; (b) Plaintiffs' and HIPAA Subclass members' computing devices; (c) Defendants' web servers; and (d) the pixels, tags, cookies, and software development kits Defendants deployed to effectuate the acquisition and transmission of patient communications. These technologies acquire the contents of users' communications with these sites contemporaneously with the user's navigation and transmit those contents to third-party servers.

155.   **Interception — §2511(1)(a).** Defendants intentionally embedded these tracking technologies on their website and intentionally configured them to capture and transmit the

40

contents of users' communications, thereby intentionally intercepting and endeavoring to intercept—and procuring others to intercept—the contents of Plaintiffs C.B. and L.M.'s and HIPAA Subclass members' electronic communications while those communications were in transmission, and redirecting those contents to Google and other third parties, persons other than the intended recipients. 18 U.S.C. § 2511(1)(a).

156.    **Disclosure — § 2511(1)(c).** Whenever Plaintiffs and HIPAA Subclass members interacted with Defendants' websites, Defendants contemporaneously and intentionally disclosed, and endeavored to disclose, the contents of those communications to third parties including Google, knowing or having reason to know that the contents were obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a). 18 U.S.C. § 2511(1)(c).

157.    **Use — § 2511(1)(d).** Defendants likewise intentionally used, and endeavored to use, the contents of those communications for purposes other than providing health care services to Plaintiffs and HIPAA Subclass members—namely, advertising, analytics, audience-building, and commercial gain—knowing or having reason to know that the contents were obtained through interception in violation of § 2511(1)(a). 18 U.S.C. § 2511(1)(d). Defendants used those communications to increase revenue from existing patients and to acquire new patients.

158.    **The party exception does not apply.** The ECPA permits a party to a communication to intercept it unless the communication "is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State." 18 U.S.C. § 2511(2)(d). Although Defendants were parties to their communications with patients, their simultaneous, undisclosed duplication and forwarding of the contents to Google does not qualify for the party exception, because Google did not participate in

41

those communications, Plaintiffs and HIPAA Subclass members did not know Google was receiving their information, and Plaintiffs and HIPAA Subclass members did not consent to that receipt.

159.   **Unlawful purpose.** Defendants' interceptions were undertaken for the purpose of committing criminal or tortious acts within the meaning of 18 U.S.C. § 2511(2)(d), including: (a) criminal violation of HIPAA, 42 U.S.C. § 1320d-6, which makes it a crime for a covered entity or business associate to knowingly disclose individually identifiable health information without authorization, and which is subject to enhanced penalties where the offense is committed to use such information "for commercial advantage, personal gain, or malicious harm"; (b) common-law invasion of privacy; and (c) breach of confidence, among others.

160.   The design of the disclosures confirms their unlawful purpose. As alleged above, Defendants routed the Google Analytics transmissions through a Planned Parenthood-branded subdomain, ppfa.plannedparenthood.org, that resolves to a Google server, so that to anyone observing the traffic the data would appear never to leave Planned Parenthood. That concealment was designed to effect the unauthorized disclosures while evading detection.

161.   Plaintiffs C.B. and L.M. and HIPAA Subclass members are entitled to all relief available under 18 U.S.C. § 2520, including statutory damages under 18 U.S.C. § 2520(c)(2) (the greater of $100 per day for each day of violation or $10,000), actual damages, punitive damages, disgorgement of profits, reasonable attorneys' fees and costs, and injunctive and declaratory relief.

**COUNT VI**
**VIOLATIONS OF THE CALIFORNIA CONFIDENTIALITY OF MEDICAL**
**INFORMATION ACT, CAL. CIV. CODE §§ 56 et seq.**
**(Plaintiff D.D. Against PPFA, on Behalf of the California Subclass)**

162.    Plaintiff D.D. re-alleges and incorporates by reference the preceding paragraphs as if fully set forth herein, and brings this Count individually and on behalf of the California Subclass against PPFA.

163.    Effective January 1, 2024, the CMIA was amended to provide that "[a]ny business that offers a reproductive or sexual health digital service to a consumer for the purpose of allowing the individual to manage the individual's information, or for the diagnosis, treatment, or management of a medical condition of the individual, shall be deemed to be a provider of health care subject to the requirements of this part." Cal. Civ. Code § 56.06(e).

164.    A "reproductive or sexual health digital service" is defined as a mobile-based application or internet website that (i) collects reproductive or sexual health application information from a consumer, (ii) markets itself as facilitating reproductive or sexual health services to a consumer, and (iii) uses the information to facilitate reproductive or sexual health services to a consumer. Cal. Civ. Code § 56.05(r).

165.    PPFA's website plannedparenthood.org qualifies as a reproductive or sexual health digital service under § 56.05(r). It collects reproductive or sexual health application information by capturing the user's selection of services from a dropdown menu that includes abortion access, birth control, STD screening, emergency contraception, pregnancy testing, and related options. Further, PPFA markets itself as facilitating reproductive services to users, and uses the collected information to facilitate reproductive health services to users.

43

166.    The user's selection of one of these services permits an inference of the user's pregnancy status, birth-control use, fertility, hormone-level concerns, or sexual activity—each of which is "reproductive or sexual health application information" under § 56.05(q).

167.    PPFA is therefore "deemed to be a provider of health care" under § 56.06(e).

168.    The CMIA prohibits a provider of health care from disclosing medical information regarding a patient without first obtaining the patient's authorization. Cal. Civ. Code § 56.10(a). The authorization must be in writing, signed and dated by the patient, and specify in detail the information to be disclosed, the recipients, the purpose of the disclosure, and the expiration of the authorization. Cal. Civ. Code §§ 56.11(b).

169.    "Medical information," as expanded by the 2024 amendments, includes "reproductive or sexual health application information" collected by a covered entity. Cal. Civ. Code § 56.05(j).

170.    PPFA's transmissions to Google bundle three categories of such information: (i) the user's ZIP code; (ii) the user's service-search input (substantive medical content); and (iii) the persistent Google cid identifier. Together, these data points are "individually identifiable" within the meaning of the statute because they include or contain elements of personal identifying information sufficient to allow identification of the individual.

171.    Plaintiff D.D. and the California Subclass are entitled to nominal damages of $1,000 per CMIA violation under § 56.36(b)(1), actual damages, punitive damages, and injunctive and declaratory relief.

44

## COUNT VII
### VIOLATIONS OF THE FLORIDA SECURITY OF COMMUNICATIONS ACT, FLA. STAT. §§ 934.01 et seq.
### (Plaintiff C.B. Against Planned Parenthood Florida, on behalf of the Florida Subclass)

172. Plaintiff C.B. re-alleges and incorporates by reference the preceding paragraphs as if fully set forth herein, and brings this Count individually and on behalf of the Florida Subclass against Defendant Planned Parenthood Florida.

173. The Florida Security of Communications Act ("FSCA") prohibits any person from intentionally intercepting, endeavoring to intercept, or procuring any other person to intercept any wire, oral, or electronic communication without the prior consent of all parties to the communication. Fla. Stat. § 934.03(1)(a)–(c). The FSCA further prohibits the use or disclosure of the contents of intercepted communications. Fla. Stat. § 934.03(1)(d)–(e).

174. Plaintiff C.B.'s and Florida Subclass members' interactions with Planned Parenthood Florida's MyChart booking page, including the form-field inputs they submitted in the course of scheduling appointments, are "electronic communications" within the meaning of Fla. Stat. § 934.02(12).

175. Planned Parenthood Florida intentionally embedded and operated various third-party trackers on its MyChart booking page. These trackers were designed and configured to duplicate, record, and transmit the contents of users' interactions—including page views, button clicks, form-field entries, and other behavioral metadata—to third-party servers in real time, contemporaneously with the user's communication with Planned Parenthood Florida.

176. The trackers' acquisition of the contents of Plaintiff C.B.'s and Florida Subclass members' communications occurred during transmission and therefore constitutes an "interception" within the meaning of Fla. Stat. § 934.02(3).

177. Planned Parenthood Florida's conduct was willful and knowing.

45

178.    Plaintiff C.B. and Florida Subclass members are entitled, under Fla. Stat. § 934.10, to statutory damages, actual damages, punitive damages, and reasonable attorneys' fees and costs.

## DEMAND FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and the proposed Class and Subclasses, respectfully requests that the Court:

a.    Certify the Nationwide Class, HIPAA Subclass, California Subclass, and Florida Subclass under Fed. R. Civ. P. 23(a), (b)(2), and (b)(3); appoint C.B., D.D., and L.M. as representatives of the Nationwide Class, C.B. and L.M. for the HIPAA Subclass, D.D. for the California Subclass, and C.B. for the Florida Subclass; and appoint undersigned counsel as Class Counsel;

b.    Declare that Defendants' conduct constituted breach of confidence and violated GBL § 349, the ECPA, the CMIA, and the FSCA;

c.    Award actual, compensatory, and nominal damages, and statutory damages as available under each claim, including GBL § 349(h), 18 U.S.C. § 2520, Cal. Civ. Code § 56.36, and Fla. Stat. § 934.10;

d.    Award punitive damages where available, and order disgorgement of Defendants' profits from the conduct alleged;

e.    Award injunctive and declaratory relief requiring, among other things, Defendants to delete the wrongfully collected data they possess, cause their third party advertising partners, e.g., Google and Meta, to delete the wrongfully collected data they possess and certify same to PPFA, remove third-party tracking technologies from plannedparenthood.org and myplannedparenthoodchart.org, redesign their Privacy Policy to comply with HIPPA, redisign

46

their cookie banner to provide adequate notice and express user consent, and notify affected members of the disclosures;

f.      Award pre- and post-judgment interest, attorneys' fees, expert fees, and costs; and

g.      Grant such other relief as the Court deems just and proper.

## **JURY TRIAL DEMAND**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs, on behalf of themselves and the proposed Class and Subclasses, demand a jury trial as to all issues so triable.

DATED:  June 19, 2026

Respectfully Submitted,

*/s/ James M. Evangelista*
James M. Evangelista
jim@ewlawllc.com
**EVANGELISTA WORLEY, LLC**
10 Glenlake Parkway,
South Tower Ste 130
Atlanta, GA 30328
Tel: (404) 205-8400
Fax: (404) 205-8395

Jennifer S. Czeisler*
Edward W. Ciolko*
Arturo Peña Miranda*
**STERLINGTON, PLLC**
228 Park Avenue South, Suite 97956,
New York, New York 10003
Tel.:    (212) 433-2993
jen.czeisler@sterlingtonlaw.com
edward.ciolko@sterlingtonlaw.com
arturo.pena@sterlingtonlaw.com

*Attorneys for Plaintiffs
and the Proposed Class*

*Pro Hac Vice Forthcoming